IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| RANDY LEE FULLER, | ) | Civil No. 09-6223-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Kathryn Tassinari
Robert Baron
Harder, Wells, Baron & Manning, P.C.
474 Willamette Street, Suite 200
Eugene, OR 97401
        Attorneys for Plaintiff

Dwight C. Holton, U.S. Attorney
Adrian L. Brown, Asst. U.S. Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
        Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Randy Fuller brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his applications for Disability Insurance Benefits and Supplemental Security Income.  Plaintiff seeks an Order reversing the Commissioner's decision and remanding the action to the Social Security Administration (the Agency) for an award of benefits.

For the reasons set out below, the decision of the Commissioner should be reversed, and the action should be remanded to the Agency for an award of benefits.

**Procedural Background**

Plaintiff filed his applications on May 11, 2006, alleging that he had been disabled since May 26, 2004, because of back problems and gout.  After his applications had been denied initially and upon reconsideration, plaintiff timely requested a hearing before an Administrative Law Judge (ALJ).

A hearing was held before ALJ John Madden, Jr., on January 22, 2009.  In a decision filed on February 3, 2009, ALJ Madden found that plaintiff was not disabled within the meaning of the Social Security Act (the Act).  That decision became the final decision of the Commissioner on June 19, 2009.  Plaintiff seeks review of that decision in this action.

**Factual Background**

Plaintiff was born on October 6, 1958, and was 50 years old at the time of the hearing before the ALJ.  He graduated high school and was enrolled in a Community College

Business Management program at the time of the hearing. Plaintiff has past relevant work as a welder, a boat outfitter, a veneer-dryer feeder, and a millwright helper. He alleged that he became disabled on May 26, 2004, because of back problems, leg pain, and gout in his feet.

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One. The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 404.1520(b).

Step Two. The Commissioner determines whether the claimant has one or more severe impairments. A claimant who does not have such an impairment is not disabled. If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three. 20 C.F.R. § 404.1520(c).

Step Three. Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled. If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.

## **Medical Record**

Chart notes dated October 8, 2003, indicate that plaintiff reported increasing pain in his great toes, and discomfort when ambulating.  Plaintiff had bony growths on the first metatarsal phalangeal joints in both great toes, and X-rays revealed degenerative changes in

the toes and metatarsal joints.  Chart notes dated October 23, 2003, indicate that bilateral

hallux rigidus, a degenerative joint disease causing bone deformity and pain, was diagnosed.

On May 3, 2004, plaintiff went to an emergency room with complaints of low back

pain radiating into his right leg and foot.  Plaintiff reported that he was "dragging his toes

when he tried to walk on the affected extremity," and complained of a significant decrease in

sensation in the affected foot.  A CT scan of plaintiff's lumbar spine showed a herniated disk

at L4-L5 with a free disk fragment posterior to the vertebral body of L5.  When he was

discharged, plaintiff continued to have significant difficulty dorsiflexing his right foot.

A herniated disc with secondary low back pain and right leg weakness was diagnosed.

Dr. Rees Freeman, a neurosurgeon, examined plaintiff on June 9, 2004.  Dr. Freeman

noted that an MRI showed "a very large disk herniation extending down from L4-5 to L5-S1

with no certainty it is not extending out from L5-S1."  He noted that a second disk herniation

extended from S5-S1, that a disk bulge at L3-4 was accompanied by moderate spinal

stenosis, and that the "neural element is very apparently compromised at L4-5 and L5-S1 by

the disk herniation described."   Dr. Freeman noted abnormalities in sensation in plaintiff's

right calf, and that heel walk was "nonexistent on the right side and toe walk is weak."

In a chart record dated June 9, 2004, Dr. Andrew Kokkino noted that he had "stepped

in to assume care of" plaintiff because Dr. Freeman had a broken arm, and plaintiff needed

"urgent intervention" because of "a very bad right footdrop . . . ."  On June 14, 2004,

Dr. Kokkino performed an L4-5 and L5-S1 hemilaminotomy/microdiscectomy.  He found

"a massive series of fragments of extruded disk material behind the right L5 vertabra."

Plaintiff suffered a recurrent disk herniation a few days after surgery, and was taken to

an emergency room by ambulance on June 20, 2004.  The following day, Dr. Kokkino

"re-explored" L5-S1 and performed microdiscectomies at that level and at L4-5.
Dr. Kokkino noted that plaintiff "had a footdrop" and reduced range of motion, strength, and
sensation in his right lower extremity.  He recommended an ankle-foot orthosis for uneven
surfaces.

During the following months, plaintiff continued to experience foot drop, and
continued to report pain in his low back, pain and numbness in his right great toe, and
numbness that made walking difficult.  In a chart note dated September 23, 2004, Cory
Huffine, a Nurse Practitioner who treated plaintiff, assessed depression and anxiety.  In a note
dated October 21, 2004, Huffine reported that plaintiff wore a leg brace and had "footdrop on
the right."  An X-ray taken on October 10, 2004, showed "degenerative changes in both great
toes at the MTP joint . . . ."  Huffine administered a joint injection of the left first MTP joint.
Plaintiff sought treatment for toe and back pain on six occasions between December 30,
2004, and May 9, 2005.

On February 25, 2005, plaintiff was diagnosed with gout and mood problems, and
Elavil and Prozac were prescribed.  Plaintiff's Elavil dosage was increased the following
month.  A chart note dated June 21, 2005, indicated that plaintiff had anxiety, which was
exacerbated by unemployment, and that plaintiff was taking Percocet for pain caused by gout.

At the request of Disability Determination Services (DDS), plaintiff was examined by
Dr. Kurt Brewster on August 16, 2005.  Dr. Brewster reported that plaintiff had foot drop on
the right, marked swelling and apparent hypertrophy over the first MTP joint, and mild
swelling over the MTP joint on the left.  He found plaintiff's attitude cooperative and his
effort good.  Dr. Brewster reported that plaintiff could lift a gallon of milk, which he
erroneously listed at 3 pounds rather than the 8-8.6 lbs. that, depending on the fat content,

a gallon of milk typically weighs.  He concluded that plaintiff had "significant problems of the lower extremity," low back pain "with radiculopathy as well as some type of degeneration of the first digit of the MTP joint bilaterally."  Dr. Brewster noted atrophy of the calf, foot drop, low strength in dorsilflexion, and low range of ankle motion.  Light touch was consistent with deficits in the L4-5 nerve roots.  Dr. Brewster opined that hypertrophy and deformity in the MTP joint would limit plaintiff "in standing and walking as well."  He opined that plaintiff could walk/stand up to 6 hours in an 8-hour work day with a 15-minute break every two hours, could lift up to 20 pounds, and could lift 10 pounds frequently.

X-rays taken on August 19, 2005, showed lumbar spondylosis at all levels, mild disk narrowing at L4-5, moderate narrowing at L5-S1, and lower lumbar facet arthritis.

At the request of DDS,  Michael Villanueva, PsyD, a licensed psychologist, examined plaintiff to address issues of depression and alcohol abuse.  Dr. Villanueva noted that plaintiff had a "history of chronic depression," had been treated with Prozac "fairly consistently" during the previous 15 years, and had been "psychiatrically hospitalized once or maybe twice."  During the previous two months, he had also been treated with Wellbutrin. Dr. Villanueva stated that plaintiff's history of depression had been "complicated by alcohol abuse," and noted that plaintiff continued to drink alcohol.  Plaintiff did not have a driver's license because of a "history of DUII and multiple citations for driving without a license or insurance."  Dr. Villanueva noted that plaintiff was enrolled in a Community College administrative medical assistant program, and that his studies were paid for through a vocational rehabilitation program.  Dr. Villanueva diagnosed a History of Alcohol Abuse with Continued Use and a History of Depression.  He also noted that plaintiff ambulated "with some stiffness and apparent discomfort."

From July, 2006, through July 25, 2007, plaintiff continued to report low back pain and toe pain. An antalgic gait and muscle spasms were noted. On January 15, 2006, plaintiff sought treatment at an emergency room for back pain that radiated into his buttocks and legs. No motor or sensory deficits were noted in plaintiff's lower extremities. Plaintiff was able to perform a heel-toe walk, and had "a questionable positive straight leg raise bilaterally." He was treated with pain medication and released.

Chart notes dated February 21, 2006, indicated that plaintiff had dropped out of school for the term.

At the request of DDS, Dr. Brewster examined plaintiff a second time on July 26, 2006. Dr. Brewster noted that plaintiff used a foot brace and a cane, and opined that their use was reasonable. He noted evidence of "atrophy, foot drop and gait abnormalities," and opined that plaintiff was limited to 2 hours of walking/standing in an 8-hour day, a substantial reduction from the 6 hours of walking/standing in an 8-hour day that Dr. Brewster had opined plaintiff could perform at the time of his examination the previous year. Dr. Brewster limited plaintiff to lifting/carrying a maximum of 10 pounds and found "frequent restrictions on climbing, stooping, crawling given foot drop and weakness." Plaintiff was unable to tandem walk because of foot drop, and could not perform a heel walk or tiptoe walk because of right ankle pain. Objective findings demonstrated evidence of disuse, particularly over the right foot. Dr. Brewster found a loss of musculature over the dorsum of the right foot and eversion deformity, and reported that plaintiff transferred on and off the table with difficulty.

Dr. G. William Salbador, a psychiatrist, examined plaintiff on August 16, 2006. Dr. Salbador diagnosed Major Depressive Disorder, recurrent, "with near complete resolution

or symptoms," and a history of alcohol abuse "vs. dependence" in sustained but incomplete remission. Dr. Salbador opined that plaintiff would very likely "continue to have difficulty with functioning related to his waxing and waning chronic pain syndrome," and rated plaintiff's Global Assessment of Functioning (GAF) at 55-60.

In an evaluation dated May 10, 2007, Dr. Daniel Stanhiser, plaintiff's treating physician, opined that plaintiff could perform light or sedentary work. He also opined that plaintiff's impairments would prevent plaintiff from maintaining a regular work schedule two days per month.

On August 20, 2007, plaintiff presented to an emergency room with complaints of left upper extremity weakness, numbness, and pain. He was diagnosed with upper extremity radiculopathy in the ulnar distribution.

X-rays of plaintiff's left foot taken on July 27, 2007, showed severe degenerative change at the first metatarsophalangeal joint. The radiologist opined that this could indicate gout, and that it might have been caused by osteoarthritis.

On October 9, 2007, Dr. G. Jason Wilks, a podiatrist, noted left foot drop, decreased sensation and muscle strength on the left, and exquisite tenderness in the left first MPJ. Dr. Wilks reported near ankylosis of the left first MPJ with flattening of the first metatarsal head and subchondral sclerosis, and a large heel spur. He diagnosed hallux limitus bilaterally and severe degenerative joint disease of the left first MPJ. Dr. Wilks recommended an MPJ fusion on the left and use of corrective footwear on the right.

An MRI taken on October 8, 2009, showed multilevel degenerative change with early encroachment of the central canal at C5-6 and marked neural foraminal narrowing at C6-7.

Plaintiff was referred to Dr. Fuller, a neurosurgeon, who diagnosed cervical spondylosis, moderately severe, with a "fairly severe" cubital tunnel syndrome in the left elbow.

Plaintiff experienced increasing neck and arm pain.  In a fax to Dr. Freeman dated November 7, 2007, Dr. Jerry Boggs stated that plaintiff had denervation in almost every left upper extremity muscle tested, and that C7 innervation was "obviously consistent with acute/ongoing C7 nerve root dysfunction."  Dr. Boggs also reported that plaintiff had "a mild ulnar neuropathy in the region of the elbow."

On November 15, 2007, Dr. Freeman discussed proceeding with anterior cervical diskectomy and fusion, and decompression of the spinal cord and nerve roots within the foramina at C5-6 and C6-7.  Dr. Freeman cautioned that a large sebaceous cyst posterior to the C4 vertebral body was pressing on the posterior cervical axis musculature, and opined that the arthritic nature of plaintiff's radiculopathy and cord deformation could be a "severe component" of plaintiff's headaches.  Dr. Freeman told plaintiff that he did not remove cysts, and that the Oregon Health Plan would not pay for cyst removal.

On December 19, 2007, Dr. Freeman performed an anterior cervical diskectomy and fusion, with decompression of the spinal cord by osteophystic intrusion and disk herniation, C5-6 and C6-7; and foraminotomies bilaterally at C5-6 and C6-7.  Before the operation, Dr. Freeman had noted that plaintiff's cervical axis bony structures were "not of the greatest quality," and that degenerative arthritis with spurring, settling, and irregular endplates predisposed plaintiff to settling of the disk spaces.

On December 27, 2007, Dr. Freeman indicated that plaintiff could "return to school with no lifting greater than 5 lbs, no looking above the head, no lifting arms above the head and no forward pressure or push/pulling on shoulders."

During an office visit on January 7, 2008, plaintiff told Paul Fieber, a physician assistant, that he had improved very little, and felt that his right side had worsened, following surgery. Fieber noted "a lot of swelling to the R hand with limited grip strength." During an office visit on January 31, 2008, plaintiff complained of continued numbness and weakness in his extremities, and Dr. Freeman told him of "the probability of nerve root being injured and needing time to recover, if it will recover."

In notes of a visit on February 6, 2008, Fieber reported that plaintiff had started to regain more feeling in his hands, but had "a new complaint of severe low back pain" which had caused him to remain in bed during the previous three weeks. Plaintiff also reported numbness, extending to his knees, in both legs. Straight leg raising was positive bilaterally at 30 degrees.

A lumbar x-ray taken on March 5, 2008, showed straightening of the lumbar lordosis, moderate changes of spondylosis deformans, with minimal but chronic anterior wedging of L1 and T12; advanced facet joint degenerative disease L4-5 and L5-S1 with posterior osteophyte formation; and possible central canal stenosis at L4-5 and L5-S1. An x-ray of the cervical spine taken the same day showed facet joint degenerative disease.

An MRI taken on April 2, 2008, showed progressive multilevel degenerative disk disease, which was much worse at L2-3 than had been shown in an earlier study, and spinal stenosis at L2-3 and L3-4.

Based upon a referral from Dr. Freeman, Dr. Bart Bruns, a pain management specialist, examined plaintiff on July 23, 2008. Dr. Bruns diagnosed spinal stenosis at L2-3 and L3-4, failed low back syndrome with bilateral radicular features, and lumbar myofascial disease. Dr. Bruns administered an epidural steroid injection at Sl-3.

On September 15, 2008, Dr. Wilks noted that plaintiff continued to complain of bilateral pain in his great toe joints.  Dr. Wilks recommended fusion or anthroplasty at the first MPJ bilaterally.

Dr. Lawrence McCree, a neurosurgeon, examined plaintiff on October 9, 2008. Dr. McCree noted that plaintiff's legs and trunk jerked involuntarily during the exam.  An MRI of the cervical spine showed neural foraminal narrowing on the left at C6-7 and herniation at C7-T1.  An MRI of the lumbar spine showed central disk herniation without significant stenosis at L2-3 and scar tissue at left L4-5.  Dr. McCree recommended selective nerve block injections at C8, C7, and at L5-S1.

On November 6, 2008, Dr. Wilks performed a right first metatarsal phalangeal joint fusion.

On November 21, 2008, plaintiff reported that he continued to experience chronic pain in his neck, low back, and right great toe.  Plaintiff was taking Prozac, Oxycodone, and Percocet, and reported increased depression.  Fieber, a physician assistant, diagnosed cervical radiculitis/neuritis, hypesthesia of the foot and calf, shortness of breath, lumbar radiculopathy, low back pain syndrome, cervical pain, gout, and chronic back pain.  He encouraged plaintiff to continue to lose weight.

Fieber responded to questions by plaintiff's counsel in an assessment dated February 13, 2009.  Fieber opined that plaintiff could not sustain work activity without missing more than 2 days of work per month, and could not lift 20 pounds occasionally or lift 10 pounds frequently.  Fieber also stated that plaintiff's significant pain issues had not improved during the year he had been Fieber's patient.

## Hearing Testimony

**1. Plaintiff's Testimony**

Plaintiff testified as follows at the hearing before the ALJ:

Because lower back pain kept him from attending some classes, plaintiff was failing three of his courses at the time of the hearing. Pain keeps plaintiff in bed some days.

Plaintiff awakens with numb hands in the morning, and his hands have not improved following his surgeries. He can sit for 15 to 20 minutes at a time, and can be on his feet for 10 minutes. Plaintiff lives by himself in an apartment, and is able to care for himself. If plaintiff feels too badly, his mother will clean and shop for him. During the previous year, pain in his lower back and neck and symptoms in his feet had kept plaintiff in bed an average of two days a week. When not attending class, plaintiff spends about half of his day lying down. He has used a cane since Dr. Kokkino advised him to do so in 2004. Dr. Kokkino also prescribed a leg brace for plaintiff's foot drop.

Plaintiff's mental health had deteriorated since he applied for disability benefits. Pain was wearing him down, and he was being treated for depression. Plaintiff's back pain had worsened since his surgeries. He typically sleeps only four hours per night, and is awakened by pain two or three times.

**2. Vocational Expert's Testimony**

The ALJ first asked the VE to consider an individual with the physical capacity assessed by Dr. Brewster, who had concluded that plaintiff was limited to lifting, carrying, pushing, or pulling 10 pounds frequently or occasionally, had no restrictions on sitting, should walk on flat surfaces because of foot drop, and could walk/stand two hours in an

FINDINGS AND RECOMMENDATION - 13

8-hour work day.  The VE testified that such an individual could not perform plaintiff's past relevant work, but could work as a semiconductor assembler, an information clerk, or a food and beverage order clerk.  These are all sedentary jobs.

The ALJ next added hypothetical limitations allowing no use of foot controls with the right foot; no climbing of ladders, ropes, or scaffolds; and only occasional stooping, crouching, and crawling.  The VE testified that none of the jobs cited above would be precluded by these limitations.  The VE testified that, if standing and walking were increased to 6 hours in an 8-hour workday, occasional lifting and carrying were increased to 20 pounds, and frequent lifting of 10 pounds was possible,  the individual could also work as a small products I assembler, a ticket seller, and a cashier II.  These are all light, unskilled jobs.

The VE testified that plaintiff had no skills that would transfer to sedentary work, and that an unskilled worker who missed work two times per month would not be able to sustain employment.

In response to further questioning, the VE testified as follows: An individual who could not lift more than 5 pounds, could not look above his head, could not lift his arms above his head, and could not apply forward pressure or push/pull with his shoulders could perform the first three jobs cited above, but could not work as an assembler or order clerk if reaching and handling were limited to occasional.  The information clerk position would be eliminated if, on two days per week,  the individual could not occasionally reach and handle bilaterally because of pain and numbness.   Consistently missing an average of one and a half days per month would be excessive, and an inability to focus for up to a half-hour at a time several times a day would be "significantly limiting."  No jobs permit employees to rest or lie down at will, at unpredictable intervals, in order to relieve pain.

**ALJ's Decision**

At the first step of his disability analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability on May 26, 2004.

At the second step, the ALJ found that plaintiff's degenerative disc disease of the lumbar and cervical spine with right foot drop, obesity, and fusion of the MTP joint on plaintiff's right great toe were severe impairments.

At the third step, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or equaled an impairment in the listings, 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ next assessed plaintiff's residual functional capacity. He found that plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, could stand and walk for 6 hours in an 8-hour work day, and could sit for 6 hours in an 8-hour work day. He found that plaintiff's ability to push and/or pull with his right lower extremity was limited; that plaintiff should use a foot brace and cane for walking on uneven surfaces; that plaintiff could not climb ladders, ropes, or scaffolds; and that plaintiff could only occasionally stoop, crouch, and/or crawl. In reaching these conclusions, the ALJ found that plaintiff's description of the "intensity, persistence and limiting effects of these symptoms" was not credible to the extent it was inconsistent with this assessment of his residual functional capacity.

At the fourth step, the ALJ found that plaintiff could not perform any of his past relevant work.

At the fifth step of his disability analysis, the ALJ found that plaintiff could work as a semi-conductor assembler, an information clerk, a food and beverage order clerk, a small

products I assembler, a ticket seller, and a cashier II.  Because these jobs exist in substantial

numbers in the national economy, he found that plaintiff was not disabled within the meaning

of the Act.


### Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity

by reason of any medically determinable physical or mental impairment which . . . has lasted

or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§ 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her

disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122

(1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan,

924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper

legal standards and the findings are supported by substantial evidence in the record as a

whole.  42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is

such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it

supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771,

772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if

"the evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at

1039-40.

**Discussion**

Plaintiff contends that the ALJ erred in failing to provide clear and convincing reasons for finding that he was not wholly credible, in failing to give clear and convincing reasons for rejecting the uncontradicted opinion of Dr. Brewster, and in rejecting the opinion of Dr. Stanhiser, plaintiff's treating physician, that plaintiff's impairments would cause plaintiff to miss work two days per month.  Plaintiff contends that the ALJ further erred in failing to carry the burden of establishing that plaintiff could perform jobs that exist in substantial numbers in the national economy.

**1.** **ALJ's Credibility Assessment**

**Standards**

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities.  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  If a claimant produces medical evidence of an underlying impairment, the ALJ  may not discredit the claimant's testimony concerning the severity of symptoms merely because they are unsupported by objective medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) citing Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1990)(en banc).  Unless there is affirmative evidence that the claimant is malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony.  Id., quoting Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).

An ALJ rejecting a claimant's testimony may not simply provide "general findings," but instead must identify the testimony that is not credible and the evidence that undermines the claimant's complaints.  Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  In addition,

SSR 96-7 requires an ALJ to consider the entire record and to consider several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment other than medication, measures other than treatment used to relieve pain or other symptoms, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."  An ALJ may support a determination that the claimant was not entirely credible by identifying inconsistencies or contradictions between the claimant's complaints and his activities of daily living.  Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).

**Analysis**

Plaintiff presented ample evidence of underlying impairments which could be expected to cause symptoms, and there was no evidence that plaintiff was malingering.  The ALJ was therefore required to provide clear and convincing reasons for concluding that plaintiff was not credible.

Plaintiff contends that the ALJ failed to provide adequate reasons for discounting his credibility.  I agree.

In setting out his reasons for concluding that plaintiff was not credible, the ALJ first asserted that plaintiff's "representation of disabling pain" was not consistent with his description of his activities to medical experts, his testimony at the hearing, reports of treating and examining practitioners, and information included in "documentary reports." The ALJ asserted that plaintiff "independently manages his personal care needs, limited by his inability to drive due to unpaid fines."

A review of the record does not support the conclusion that, except to the extent that the severity of his symptoms fluctuated over time,  plaintiff's description of his activities was

internally inconsistent or inconsistent with evidence in the medical record. In a disability questionnaire, plaintiff stated that some days he can only manage to walk to the bathroom and feed himself, that dressing himself causes him pain, and that some days he does not shower because of pain. This was not inconsistent with plaintiff's testimony that he cares for himself, but receives assistance from his mother when he has too much pain, or his testimony that, on average, pain keeps him in bed two days a week. Plaintiff's description of his symptoms in the questionnaire and at the hearing was generally consistent with the limitations he described to examining and treating physicians, and is consistent with the quantity and variety of pain medication that treating physicians have prescribed.

The ALJ next asserted that plaintiff had a "history of 3 DUIs, but remained evasive about his alcohol usage throughout the medical record." As an example, he cited emergency room records indicating that plaintiff "smelled of alcohol" and had a blood alcohol level of "50 mg despite his claim that he did not drink regularly." As plaintiff correctly notes, drinking, even to excess, at any particular time is not inconsistent with plaintiff's assertion that he did not drink "regularly."

The ALJ cited plaintiff's testimony that his back pain worsened after surgeries as inconsistent with the medical record. Some post-surgery records indicate that plaintiff initially thought his condition had improved. However, a number of post-surgery records note that plaintiff thought that surgery had not improved his level of comfort or functioning, and some records note that plaintiff thought his condition had deteriorated following surgery. The fact that plaintiff's opinions of his condition post-surgery varied over time is as likely a reflection of changing levels of pain and impairment, as any indication that plaintiff was not wholly credible. In addition, a number of objective medical records fully corroborate

FINDINGS AND RECOMMENDATION - 19

plaintiff's assertion that he continued to have significant back pain and other symptoms even after multiple surgeries.

The ALJ asserted that plaintiff's credibility was diminished because he had testified at one point that he was "failing all of his classes due to his impairments," but later testified that he believed he would pass his classes, and because, though he reported that his GPA had "suffered," because of his impairments, school records "show an up and down fluctuation as a pattern." These arguments are not clear or convincing. Plaintiff did testify that he was failing several classes, but added that he had not given up, and thought he could "still pull them out." There is no inconsistency between these statements, or between plaintiff's assertion that his GPA had suffered because of his impairments, and the fact that his GPA fluctuated. Plaintiff testified that the severity of his impairments fluctuated, which could account for a fluctuation in scholastic performance, and his performance certainly could have fluctuated, though in a higher range, absent those impairments.

The ALJ asserted that plaintiff "reported lots of limitations at one point, and the following day listed numerous additional activities which he was capable of performing." This is apparently a reference to plaintiff's report to Dr. Salbador that he spent two hours a day cooking and cleaning, went grocery shopping once a month, and did not need assistance with self-care, and his statements to Dr. Brewster the day before indicating that he took care of activities of self care such as bathing, washing his hair, spent zero to one and a half hours a day doing housework, and was limited in his ability to perform housekeeping activities half of the time. Like plaintiff, I see no meaningful inconsistency in these descriptions of plaintiff's activities. Indeed, Dr. Salbador noted that plaintiff had indicated that he generally did his typical activities everyday, but that he could do none of those activities on the "bad

days" that he experienced 6 or 7 days a month, and that he struggled to bathe and wash even on good days.

The ALJ also asserted that plaintiff's credibility was diminished because he at one time told doctors that he had been healthy before the date of the alleged onset of disability, but then reported that an old CT scan had shown disease 15 years earlier. Like plaintiff, in the many pages of medical records that the ALJ generally cites in support of this argument, I have not found plaintiff's alleged statement that he had not had any medical problems before the date of the alleged onset of his disability.

The ALJ here simply did not provide clear and convincing reasons for concluding that plaintiff was not credible. Under these circumstances, the question is whether there are outstanding issues that must be resolved before a determination of disability can be made, and whether it is clear from the record that an ALJ crediting plaintiff's testimony would be required to find that plaintiff is disabled. E.g., Moisa v. Barnhart, 367 F.3d 882, 887 (9th Cir. 2004).

The record here is fully developed, and requires no "further agency expertise or evaluation . . . ." Id. An ALJ who credited plaintiff's testimony would be required to conclude that plaintiff's severe impairments would require plaintiff to miss work several days a month, and that, when plaintiff was able to appear for work, those impairments would require him to take long, unscheduled breaks. The VE testified that an individual with these attendance and performance limitations would not be able to maintain competitive employment. Under these circumstances, this action should be remanded to the agency for a finding of disability and an award of benefits. Though it needs no additional support, this

conclusion is only strengthened by analysis of plaintiff's other objections to the

Commissioner's decision, which are briefly discussed below.


## 2. Rejection of Dr. Brewster's Second Opinion

As noted above, at the request of DDS, Dr. Brewster examined plaintiff on two

occasions.  Based upon an examination of plaintiff in August, 2005, Dr. Brewster concluded

that plaintiff could walk/stand for a total of 6 hours in an 8-hour work day.  Based upon his

examination of plaintiff nearly a year later, Dr. Brewster opined that plaintiff was limited to

2 hours of standing/walking in an 8-hour work day, could lift and carry a maximum of 10

pounds, and, because of foot drop and weakness, had "frequent" restrictions on climbing,

stooping, and crawling.

The ALJ rejected Dr. Brewster's second opinion concerning plaintiff's ability to walk

and stand, asserting that:

> Dr. Brewster's second assessment is given minimal weight because recent
> evaluations suggest it was overly limited; however, it is noted that the
> Administrative Law Judge posed a similar RFC hypothetical to the vocational
> expert and the vocational expert testified that jobs still exist in significant
> numbers which the claimant could perform.

The opinions of examining physicians are entitled to greater weight than the opinions

of non-examining physicians.  Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990).  An ALJ

must provide clear and convincing reasons for rejecting the uncontradicted opinions of an

examining physician, id., and must provide specific and legitimate reasons that are supported

by substantial evidence in the record for rejecting an examining physician's opinion that is

contradicted by another physician.  Andres v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995).

Plaintiff contends that Dr. Brewster's second opinion was not contradicted, and argues that the ALJ failed to provide clear and convincing reasons for its rejection.  I disagree with plaintiff's assertion that Dr. Brewster's second opinion was uncontradicted: Non-examining Agency medical consultants who reviewed the record concluded that plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently, and could stand and/or walk for 6 hours during an 8-hour work day.  However, I conclude that the ALJ failed to provide specific and legitimate reasons, that are supported by substantial evidence in the record, for rejecting the opinion that Dr. Brewster offered based upon his second examination of plaintiff.  The ALJ's assertion that Dr. Brewster's second opinion was invalid because "recent evaluations suggest it was overly limited" is not specific: The ALJ cited to no particular evaluations by a treating or examining physician that were inconsistent with Dr. Brewster's second opinion.  If the ALJ was referring to the opinions of Agency reviewing consultants, those opinions are entitled to less weight than an examining physician like Dr. Brewster.  In any event,  review of the evaluations performed by treating physicians does not support the ALJ's contention that more recent medical evidence suggested that Dr. Brewster's evaluation was "overly limited."  The medical record shows that, after he was evaluated a second time by Dr. Brewster, plaintiff underwent cervical and lumbar surgeries and foot surgeries, and that subsequent MRIs revealed additional cervical and lumbar disc herniations.  After one of these later surgeries, Dr. Fuller assessed limitations greater than those assessed by Dr. Brewster.

The ALJ simply did not provide adequate reasons for rejecting the opinion Dr. Brewster expressed based upon the second examination.  Dr. Brewster's opinion was

supported by substantial other evidence in the medical record, and as an examining physician, his opinion was entitled to greater weight than the opinions of non-examining consultants.

### 3. Rejection of Dr. Stanhiser's Opinion

In May, 2007, Dr. Stanhiser, a treating physician, opined that, though plaintiff could perform both light and sedentary work, his impairments would cause him to miss scheduled work two times per month. The ALJ rejected Dr Stanhiser's opinion concerning the effects of plaintiff's limitations on his ability to attend work as "only speculation."

Plaintiff contends that the ALJ did not provide the required support for rejecting Dr. Stanhiser's opinion concerning the effects of plaintiff's impairments on his work attendance. I agree. The opinions of treating physicians are given greater weight than the opinions of other physicians. Rodriguz v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989). An ALJ must support the rejection of a treating physician's opinion with "findings setting forth specific and legitimate reasons for doing so that are based upon substantial evidence in the record," Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989), and must provide clear and convincing reasons for rejecting a treating physician's uncontroverted opinions. Lester v. Chater, 81 F.2d 821, 830-31 (9th cir. 1995). The ALJ provided no support for his assertion that Dr. Stanhiser's opinion concerning the effects of plaintiffs severe and well documented impairments was speculative. Dr. Stanhiser's medical opinion concerning the severity and expected effects of plaintiff's symptoms was consistent with substantial evidence in the medical record.

**4. <u>Step Five of the ALJ's Disability Analysis</u>**

At the fifth step of disability analysis, the Commissioner bears the burden of establishing that a claimant can perform jobs that exist in substantial numbers in the national economy. Plaintiff contends that the ALJ failed to meet that burden.

I agree. Where, as here, an ALJ fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, that opinion is credited as a matter of law. <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995). If Dr. Stanhiser's opinion that plaintiff would miss two days per month because of his physical impairments is credited, a finding of disability is required, because the VE testified that an individual who would miss that much work could not maintain competitive employment. For this reason, and for the reasons set out above, the Commissioner's decision should be reversed and this action should be remanded to the agency for an award of benefits.

### <u>Conclusion</u>

A judgment should be entered REVERSING the decision of the Commissioner and REMANDING this action to the Agency for an award of benefits.

### <u>Scheduling Order</u>

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due June 17, 2011. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

FINDINGS AND RECOMMENDATION - 25

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 31st day May, 2011.


/s/ John Jelderks
John Jelderks
U.S. Magistrate Judge